## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JONATHAN RUSSO, | : | CIVIL ACTION NO. 1:25-CV-503 |
| | : | |
| Plaintiff | : | (Judge Neary) |
| | : | |
| v. | : | |
| | : | |
| KATHY HILEMAN, *et al.*, | : | |
| | : | |
| Defendants | : | |

### MEMORANDUM

This is a prisoner civil rights case in which plaintiff alleges that defendants employed by the Adams County Adult Correctional Complex ("ACACC") violated his civil rights in various ways. The complaint will be dismissed except to the extent plaintiff alleges excessive force, assault, and battery by defendant Vandergrift. As explained below, plaintiff will be granted leave to amend several claims in the instant case, several other claims will be severed into separate lawsuits for which plaintiff will be required to file amended complaints and either pay the requisite filing fee or move for leave to proceed *in forma pauperis*, and all other claims will be dismissed without prejudice to plaintiff's right to refile the claims in new lawsuits.

### I.    Factual Background & Procedural History

Plaintiff Jonathan Russo filed this case on March 15, 2025, and the court received and docketed his complaint on March 19, 2025. (Doc. 1). According to the

complaint, Russo was first admitted into ACACC on January 26, 2023,[1] where he was placed in housing block 2-A, which was used for strip searches. (Id. ¶ 2). Russo was given one smock, one blanket, no sandals or socks, and no reading or writing material. (Id. ¶ 3). Russo, noticing that the air conditioner was on, asked an officer if it could be turned off and if he could be given an extra blanket, but his requests were denied. (Id. ¶¶ 4-5). After Russo was transferred to the prison's general population, he filed a grievance complaining about the cold conditions of the cell block he had been in. (Id. ¶ 6). His grievance was purportedly denied because he could not complain about the conditions of a housing block in which he was no longer housed. (Id. ¶ 8).

Russo was again placed in housing block 2-A approximately one year later, on January 30, 2024, when he was placed in disciplinary custody. (Id. ¶ 9). Russo filed another grievance about the cold temperatures in the housing block and requested that the air conditioning be turned off and the heat turned on. (Id.)

On October 16, 2023, Russo purportedly filed a grievance complaining that the shower water temperature in block 2-A was too cold. (Id. ¶ 13). A correctional officer purportedly checked the water temperature and agreed that it was too cold, but defendant Reisinger nonetheless denied Russo's grievance complaining about the cold water. (Id. ¶¶ 16-17).

---

[1] The complaint alleges incidents on a variety of dates over more than a year, but does not arrange them in chronological order. The court summarizes plaintiff's allegations in the order in which he has made them.

The complaint alleges that Russo filed grievances complaining about issues with his food trays on March 2, 2023, March 8, 2023, and March 10, 2023. (Id. ¶ 18). In one of the grievances, Russo alleged that he found a piece of metal in his food on February 27, 2023. (Id. ¶ 19). A correctional officer purportedly confirmed that there was metal in the food after examining it. (Id. ¶ 20). On March 6, 2023, a lieutenant in the prison took pictures of Russo's bowel movement, which purportedly contained blood and metal. (Id. ¶ 21). Russo had purportedly been in excruciating pain and had not been regularly moving his bowels since eating a portion of the meal that contained metal. (Id. ¶ 22). Russo's grievance purportedly alleged that the metal was placed in his food intentionally in retaliation for Russo's earlier grievance, but does not state who placed the metal in the food. (Id. ¶ 24).

Perez, the prison's food service director, denied the grievance and directed Russo to "follow proper protocol" for all future complaints about the contents of his food trays. (Id. ¶ 23). The complaint alleges that, contrary to Perez's statement, Russo did follow proper protocol when he reported the metal in his food. (Id.) Russo went to the medical unit for pain following his bowel movement and defendant Tammy Eckenrode, a nurse in the prison, asked him "what he wanted her to do." (Id. ¶ 25). Russo purportedly responded that he expected Eckenrode, as a nurse, to know what to do, at which point Eckenrode allegedly removed Russo from the medical unit and did not provide him any further treatment. (Id. ¶ 26).

The complaint alleges that on July 18, 2023, prison officials accused Russo of receiving a tattoo from his cellmate. (Id. ¶ 28). Defendant Vandergrift purportedly came to Russo's cell and told him to put his jumpsuit on. (Id. ¶ 29). Vandergrift then

told Russo to face the wall of the cell. (Id. ¶ 30). Russo asked him why, and Vandergrift purportedly stated that it was because Russo was being transferred from block 2-B to block 2-A. (Id.) Russo allegedly tried to "reason" with Vandergrift and asked why he was put in "the hole" every time he was accused of misconduct. (Id. ¶ 31). Vandergrift responded by pulling out a can of pepper spray. (Id. ¶ 32). At that point, Russo turned and faced the wall as instructed so that Vandergrift could put restraints on him. (Id. ¶ 33). After Russo was facing the wall and had his arms in the air, Vandergrift allegedly pepper-sprayed him in the back of the head, neck, and back. (Id. ¶ 34). Vandergrift then left the cell and did not return for approximately an hour, leaving Russo to remain in the pepper-sprayed cell. (Id. ¶ 35).

Defendant Vandergrift returned to the cell with a use of force team and Russo complied with the officers' request to restrain him. (Id. ¶ 37). Defendants Murkison and Livingston were purportedly "excessive" in applying the restraints and used "their body weight and strength to apply [the restraints] in areas and ways that the restraints would hurt and cause pain to the plaintiff." (Id. ¶ 38). After the incident, defendant Vandergrift purportedly falsified information on an internal report to indicate that he pepper-sprayed Russo only after Russo became combative. (Id. ¶ 39). Russo purportedly responded to the use of force by Murkison and Livingston by using "obscene language." (Id. ¶¶ 41-42). Defendants then purportedly removed his clothing "in an excessive and forceful manner." (Id. ¶ 43).

Defendant Reisinger allegedly conducted a disciplinary hearing after the incident. (Id. ¶ 45). Reisinger allegedly refused to call any of the witnesses who were willing to testify on Russo's behalf, including a correctional officer who was on the

use of force team, a nurse, and two other inmates. (Id.) Reisinger, relying on video evidence and Vandergrift's account of the incident, found Russo guilty of misconduct. (Id.) Reisinger purportedly sentenced him to 70 days in solitary confinement. (Id. ¶ 48). Russo subsequently filed a grievance complaining about the incident, but defendant Hileman, the prison's warden, purportedly denied relief. (Id. ¶ 49).

The complaint alleges that on October 23, 2023, defendant Raylock, a correctional officer in the prison, ordered a five-person extraction team to remove Russo from his cell because Russo's cellmate required a single cell, but Russo refused to leave the cell. (Id. ¶ 52). Russo purportedly "felt threatened and in fear for his life and felt the need to defend himself against the assault they were preparing for." (Id. ¶ 55). Defendant Bectle then opened the food slot on his cell door to pass food in. (Id. ¶ 56). Russo stuck his arm through the slot to prevent Bectle from closing it. (Id.) Bectle allegedly attempted to slam the slot down on Russo's arm "using his body weight." (Id. ¶ 57). Bectle's action caused a 2-3-inch scar on Russo's arm that has led to permanent scarring. (Id.) Raylock and the five-person extraction team then returned to the cell and allegedly "proceeded to assault" Russo. (Id. ¶ 58). Raylock purportedly pepper-sprayed Russo at least three times before entering the cell and physically restraining Russo. (Id. ¶ 59).

Following the alleged assault, the officers placed Russo in a restraint chair and later moved him to a strip cell. (Id. ¶ 61). Russo then spoke with Raylock, and Raylock allegedly stated that the officers had made a mistake, and that Russo was actually supposed to be moved into a cell with another inmate, Richard Wajda. (Id. ¶

62). Russo asked several correctional officers whether they were aware of any other incidents where an extraction team had been used in a similar incident, and they all purportedly said they were not. (Id. ¶¶ 63-65). Several misconduct charges were filed against Russo for this incident, but all were dismissed on October 27, 2023. (Id. ¶ 66). After these misconduct charges were dismissed, however, another misconduct charge was filed against Russo thirteen days later. (Id. ¶ 67). The complaint asserts that the new misconduct charge was filed in retaliation for Russo filing grievances because other inmates who had similarly refused a cell assignment had not been charged with misconduct. (Id. ¶¶ 69-72).

While Russo was in a strip cell following this incident, he was taken to a misconduct hearing arising from a separate, unspecified incident on November 7, 2023. (Id. ¶ 73). Because he was in a strip cell, he did not have any writing materials to prepare a proper defense to the charges. (Id. ¶ 74). Russo brought this to the attention of defendant Reisinger, who presided over the hearing, and asked for an extension of time, but Reisinger purportedly stated that this was not his problem and denied the request. (Id. ¶¶ 75-76). According to the complaint, this statement proves that Reisinger was biased against Russo and had predetermined his guilt. (Id. ¶ 77). Reisinger found Russo guilty and sentenced him to additional solitary confinement. (Id. ¶ 78).

Around the time of this incident, Russo purportedly learned that all of the officers whom he had asked about past use of extraction teams were purportedly placed under investigation by the prison. (Id. ¶ 79). Russo filed a grievance complaining that the officers should not have been placed under investigation. (Id. ¶

80). The grievance was denied, with prison officials informing Russo that this was not an issue he could grieve. (Id.)

The complaint alleges that "some time toward the end of January 2024," Russo was charged with failing to report contraband, despite reporting the relevant contraband to defendant Heather Diehl. (Id. ¶ 83). Based on the charge, defendant Raylock allegedly handcuffed Russo and brought him to a conference room, where he informed him that he was being moved to another cell because of concerns that Russo had more contraband in the cell. (Id. ¶ 84). Russo complained that he was being moved to a cell where he would not be able to socialize with other inmates and that he was being punished for reporting contraband. (Id. ¶ 85). The thought of being moved to a cell where he could not socialize purportedly caused Russo to have a "mental breakdown." (Id. ¶ 86). Russo was ordered to stand so that he could be moved to the new cell, but Russo continued to "cry and try to reason with defendant Raylock." (Id. ¶ 87). Raylock then allegedly pepper-sprayed Russo in the face while he was crying with his hands handcuffed behind his back. (Id. ¶ 88). Correctional officers Hatfield and French and lieutenant Devon were purportedly present when Raylock pepper-sprayed Russo, and 1-2 more unknown officers may also have been present. (Id. ¶ 89). The complaint alleges that Raylock pepper-sprayed Russo in retaliation for his past grievances against Raylock. (Id. ¶ 91).

The complaint alleges that "sometime between the months of November and January"[2] Russo was "placed in the emergency restraint chair after an extraction he felt was unnecessary and an assault on his person." (Id. ¶ 93). Russo allegedly refused to be removed from the restraint chair due to fear that he would be assaulted again. (Id. ¶ 94). Defendants Raylock and Livingston allowed Russo to remain in the chair for 16 hours. (Id. ¶ 95). Russo made several requests to be given his prescribed medications during this period, but his requests were denied. (Id. ¶ 96). Defendant Sandra Abby was informed that Russo remained in the restraint chair and administered Seroquel and "other medications to calm him down." (Id.) After sixteen hours in the restraint chair, Russo was transported by ambulance to an outside hospital, where medical staff administered Haldol and other sedatives. (Id. at ¶ 97). Russo was admitted to the hospital for the next four days "due to something with his blood and being in the [restraint chair] for 16 hours straight." (Id. ¶ 98). Russo was discharged from the hospital after the four days and defendant Reisinger transported him back to the prison. (Id. ¶ 99). Before he could be transported, however, Reisinger and two other correctional officers physically restrained him using "arm bars and choke holds" to Russo's neck and throat, and a Jane Doe nurse in the prison sedated him. (Id. ¶¶ 100-03).

The complaint alleges that on February 1, 2024, Russo was "waist chained and cuffed" so that he could participate in a disciplinary hearing conducted by

---

[2] The complaint does not specify the years Russo is referring to, but given the dates otherwise alleged in this complaint the court assumes the complaint is referring to November 2023 and January 2024.

defendant Reisinger regarding the October 23, 2023, extraction from his cell. (Id. ¶ 108). Russo complained that Reisinger was biased against him based on his earlier comments. (Id. ¶ 110). Reisinger purportedly became irritated, which Russo then asserted was another reason that Reisinger was biased against him. (Id. ¶ 111). After Russo continued to press this objection, Reisinger purportedly told him that he would be removed from the hearing if he did not stop making the objection. (Id. ¶ 113). Russo reached for his papers during the hearing to defend himself, at which point Reisinger purportedly "attacked" Russo, using a "take down technique." (Id. ¶ 114). Reisinger's actions caused Russo to have a minor concussion and six stitches. (Id.) He was transported to an outside hospital for treatment. (Id.) Reisinger purportedly stated that he used forced because Russo was reaching for the hearing voice recorder. (Id. ¶ 115). Another officer who was present at the hearing purportedly accused Russo of spitting on Reisinger and charged Russo with misconduct for assault and other charges. (Id. ¶ 117). Russo purportedly requested that the prison preserve video evidence of the hearing and contacted the Pennsylvania State Police to press charges against Reisinger, but his requests were purportedly ignored. (Id. ¶ 118).

The complaint alleges that on August 1, 2023, Russo filed a complaint against defendant Knott pursuant to the Prison Rape Elimination Act ("PREA") for unspecified conduct. (Id. ¶ 124). Prison staff purportedly filed misconduct charges against Russo for filing the PREA complaint. (Id. ¶ 127). The complaint alleges that defendants Hileman and Alvarez did nothing to investigate his PREA complaint and failed to prevent continued sexual harassment by Knott. (Id. ¶¶ 128-29).

On August 30, 2023, Russo filed a grievance against defendant Sellman for purportedly skipping his cell when passing out meal trays and then waiting until all other inmates had been given their meals before giving Russo his. (Id. ¶¶ 130-31). Russo also alleged that Sellman refused to give Russo his tablet on one occasion and "ma[de] fun of plaintiff in company of others." (Id. ¶ 131).

On October 22, 2023, Sellman ordered Russo to pass a styrofoam cup through the meal slot on his cell door. (Id. ¶ 133). Sellman then crushed the cup against the window of the cell and purportedly told Russo that he would crush Russo like he crushed the cup. (Id.) Russo filed a grievance about this incident, but defendant Raylock denied the grievance, concluding that Sellman's statement was a joke. (Id. ¶ 134).

On September 23, 2023, defendant Lawyer[3] allegedly denied Russo a razor and a shower. (Id. ¶ 138). After Russo returned to his cell, Lawyer also purportedly slammed the cell door against Russo's back. (Id. ¶ 140). On September 29, 2023, Russo allegedly had an "altercation" with multiple correctional officers regarding the use of the telephone. (Id. ¶ 141). Lawyer responded to the incident, returned Russo to his cell, and again slammed the door against Russo's back. (Id.) The complaint alleges that these two incidents of slamming the door were retaliation for Russo complaining about the denial of the razor and shower. (Id. ¶ 142). Lawyer also purportedly denied Ruso the use of a shower on another unknown date. (Id. ¶

---

[3] This appears to be the defendant's last name and not a reference to a John Doe attorney.

143). The complaint additionally alleges that on another unknown date, Lawyer heard Russo comment that correctional officer Bissette was pretty. (Id. ¶ 146). In response, Lawyer purportedly told Russo that Bissette likes "older men" and that she does not like Russo because Russo has a "small penis." (Id.) The complaint alleges that Lawyer yelled this to Russo while holding his thumb and finger an inch apart "indicating a small penis." (Id. ¶ 147). Lawyer was then allegedly transferred to another housing block sometime later after purportedly calling Russo a "pussy" and stating that Russo "didn't have the balls to assault him." (Id. ¶ 148). Russo purportedly blocked out the door to his cell to protest Lawyer's actions and request disciplinary actions against him. (Id. ¶ 149). Defendant Diehl purportedly told Russo that Lawyer had been reprimanded but that she could not detail the specific reprimand because Russo was an inmate. (Id. ¶ 150).

Sometime in July or August of 2023, Russo purportedly informed medical staff that the Trazodone that had been prescribed to him by defendant Abby "was causing him to maintain an erection all night long." (Id. ¶ 153). The prescription was allegedly discontinued at that time. (Id. ¶ 154). Russo complained to Abby, however, that no medication had been prescribed as a substitute for the Trazodone, and that he was therefore suffering from the anxiety and insomnia the Trazodone was originally prescribed to treat. (Id. ¶¶ 155-56). Abby allegedly failed to prescribe a replacement medication until approximately 4-5 months later, following the incident in which he remained in a restraint chair for approximately 16 hours. (Id. ¶¶ 157-58).

The complaint alleges that "due to all the hardships endured" Russo "started to commit multiple self-harm acts." (Id. ¶ 162). On January 28, 2024, he purportedly was charged with misconduct for smearing feces on his cell wall and banging his head against the door. (Id. ¶ 163). On January 29, 2024, he was given another misconduct for banging his head against the door. (Id. ¶ 164). During this incident, defendant Weible purportedly pepper-sprayed Russo. (Id. ¶ 165).

On February 1, 2024, Russo allegedly tried to rip the stitches out of his head that he received when defendant Reisinger purportedly assaulted him. (Id. ¶ 166). In response, defendant Raylock allegedly pepper-sprayed Russo. (Id.) Russo attempted to pull the stitches out again on February 6, 2024. (Id. ¶ 167). On the same date, he allegedly tried to cut his wrists on the underside of the desk in his cell. (Id. ¶ 168). Russo was placed in a restraint chair. (Id. ¶ 169). Russo again attempted to cut his wrists on his desk and banged his head against his cell door on February 7, 2024, which purportedly caused defendant Weible to pepper-spray him. (Id. ¶ 170).

The complaint alleges that on September 20, 2023, Russo received a visit from his attorney, who purportedly told him that the prison, through orders by defendants Hileman and Reisinger, had banned Russo from receiving phone calls on the unmonitored attorney-client phone. (Id. ¶ 175). The complaint alleges that he subsequently attempted to have a phone call with his attorney on the attorney-client phone and prison officials monitored the call. (Id. ¶¶ 178-80). It is further alleged that prison officials only allowed Russo to make outgoing calls to his attorney, which he had to pay for out of pocket, and that they disallowed him from requesting legal calls through shift commanders as prisoners were usually allowed

to do. (Id. ¶¶ 181-82). Defendant Reisinger denied Russo's grievances regarding these matters. (Id. ¶¶ 183-84).

The complaint alleges that defendant Smith conducted another disciplinary hearing at some point during these events and sentenced Russo to an additional 1 ½-2 years in solitary confinement and loss of all privileges. (Id. ¶ 190). All the grievances Russo filed related to his allegations were allegedly handled by defendant Snyder before eventually reaching defendant Hileman. (Id. ¶ 195). The complaint alleges that Snyder conducted "frivolous investigations and always agreed with everything that opposed plaintiff's complaint." (Id. ¶ 196). Snyder also allegedly accused Russo of falsifying documents because Russo made carbon copies of his grievances after submitting them. (Id. ¶ 197).

The complaint asserts the following claims for relief: (1) claims of excessive force in violation of the Fifth, Eighth, and Fourteenth Amendments against defendants Hileman, Reisinger, Vandergrift, Raylock, Murkison, Livingston, Bectle, Weible, and Lawyer; (2) claims of assault and battery under Pennsylvania law against Hileman, Reisinger, Vandergrift, Raylock, Murkison, Livingston, Bectle, Weible, and Lawyer; (3) claims of failure to intervene against defendants Hileman, Snyder, Reisinger, and Alvarez; (4) claims of falsifying misconduct charges and retaliation by Reisinger, Vandergrift, Raylock, Diehl, Lawyer, Murkison, Sellman, Livingston, Bectle, and Knott; (5) claims of violation of due process during disciplinary proceedings against Reisinger, Smith, and Hileman; (6) claims of violation of Russo's right of access to the courts against Reisinger and Snyder; (7) claims of inadequate medical care and mental health care against Eckenrode, Abby,

O'Neal, and Jane Doe; (8) claims of negligence and medical malpractice against

Eckenrode, Abby, O'Neeal, and Jane Doe; (9) a claim against defendant Perez for

"failing to prepare and serve food safe enough to consume causing plaintiff to ingest

metal"; and (10) a claim of negligence against Perez.

## II.  **Legal Standard**

The Prison Litigation Reform Act authorizes a district court to review a

complaint in a civil action in which a prisoner is proceeding *in forma pauperis* or

seeks redress against a governmental employee or entity. See 28 U.S.C. §

1915(e)(2);[4] 28 U.S.C. § 1915A.[5] The court is required to identify cognizable claims

---

[4] 28 U.S.C. § 1915(e)(2) provides:

**(2)** Notwithstanding any filing fee, or any portion thereof, that may
have been paid, the court shall dismiss the case at any time if the court
determines that—
    **(A)** the allegation of poverty is untrue; or
    **(B)** the action or appeal—
        **(i)** is frivolous or malicious;
        **(ii)** fails to state a claim on which relief may be granted; or
        **(iii)** seeks monetary relief against a defendant who is
        immune from such relief.

[5] 28 U.S.C. § 1915A provides:

**(a) Screening.**--The court shall review, before docketing, if feasible or,
in any event, as soon as practicable after docketing, a complaint in a
civil action in which a prisoner seeks redress from a governmental
entity or officer or employee of a governmental entity.
**(b) Grounds for dismissal.**--On review, the court shall identify
cognizable claims or dismiss the complaint, or any portion of the
complaint, if the complaint--
    **(1)** is frivolous, malicious, or fails to state a claim upon which
    relief may be granted; or
    **(2)** seeks monetary relief from a defendant who is immune from
    such relief.

and to *sua sponte* dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. See 28 U.S.C. § 1915(e)(2)(B); 28 U.S.C. § 1915A(b).

In screening claims under Sections 1915A(b) and 1915(e)(2)(B), the court applies the standard governing motions to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See, e.g., Coward v. City of Philadelphia, 546 F. Supp. 3d 331, 333 (E.D. Pa. 2021); Smith v. Delaware, 236 F. Supp.3d 882, 886 (D. Del. 2017). This standard requires the court to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they

15

are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556). A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

Courts must liberally construe complaints brought by *pro se* litigants. Sause v. Bauer, 585 U.S. 957, 960 (2018). *Pro se* complaints, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007).

### III.  Discussion

Russo's federal constitutional claims are filed pursuant to 42 U.S.C. § 1983. Section 1983 creates a cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a Section 1983 claim, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

A defendant cannot be liable for a violation of a plaintiff's civil rights unless the defendant was personally involved in the violation. Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 289 (3d Cir. 2018). The defendant's personal involvement cannot be based solely on a theory of *respondeat superior*. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, for a supervisor to be liable for the actions of

a subordinate, there must be allegations of personal direction or actual knowledge and acquiescence. Id. A defendant's after-the-fact review of a grievance is not sufficient to establish the defendant's personal involvement in an underlying violation of the prisoner's rights. Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020).

### A.    Joinder

At the outset, the court will address whether the claims in this case have been properly joined in the same lawsuit. Under Federal Rule of Civil Procedure 20, claims against multiple defendants may be joined in the same action only if:

> **(A)** any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> **(B)** any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2).

When claims have been misjoined, a district court may either: (1) dismiss the misjoined claims from the case without prejudice on "just terms" or (2) sever the claims into separate lawsuits. Fed. R. Civ. P. 21; DirecTV, Inc. v. Leto, 467 F.3d 842, 845 (3d Cir. 2006). The statute of limitations for dismissed claims is not tolled because the initial complaint is treated "as if it never existed." Id. (quoting Brennan v. Kulick, 407 F.3d 603, 606 (3d Cir. 2005)). When, on the other hand, the claims are severed, "the suit simply continues against the severed defendant in another guise." Id. (citing White v. ABCO Eng'g Corp., 199 F.3d 140, 145 n.6 (3d Cir. 1999)).

District courts have discretion to choose whether misjoined claims should be dismissed or severed but may only dismiss misjoined claims if doing so would "not

prejudice any substantial right" of the plaintiff. Id. (quoting Sabolsky v. Budzanowski, 457 F.2d 1245, 1249 (3d Cir. 1972)). "Hence, a court must analyze the consequences of a dismissal on a claimant's ability to meet the statute of limitations prior to choosing dismissal over severance." Id.

In this case, Russo's claims are clearly misjoined in violation of Rule 20. The complaint contains numerous grievances about seemingly every aspect of plaintiff's confinement over a period of more than a year, with nothing connecting the claims other than the fact that they all occurred in the same prison and plaintiff's vague and unsupported speculation that the prison's warden condoned essentially every alleged civil rights violation. This speculation is not sufficient to join the claims in the same lawsuit under Rule 20.

Because the claims have been misjoined, the court must consider whether Russo would be able to timely file his claims in a new lawsuit if the misjoined claims were dismissed from this lawsuit. DirecTV, 467 F.3d at 845. Russo's claims are subject to Pennsylvania's two-year statute of limitations for personal injury actions. Moore v. Walton, 96 F.4th 616, 622 (3d Cir. 2024). Several of plaintiff's claims would be outside this limitations period if they were filed in a new lawsuit, specifically: (1) the claims arising from allegedly cold temperatures in the prison; (2) the claims arising from Russo's allegations that he ingested a piece of metal; and (3) the claims arising from alleged excessive force by defendant Vandergrift. Additionally, although Russo's claims arising from his PREA complaint against defendant Knott would not be outside of this limitations period because they accrued on August 1, 2023, the court finds that it would not be practical for to file a new lawsuit within

the limitations period because the limitations period would expire only one day after the date of this opinion.

The court will allow the present action to proceed solely with respect to Russo's claims arising from the alleged use of excessive force by defendant Vandergrift. The three other claims for which plaintiff would not be able to timely file a new action will be severed into separate cases. In the interest of judicial economy, however, the court will dismiss these severed claims on their merits[6] and require plaintiff to file an amended complaint in each of the severed cases.

All of Russo's other claims accrued, at the earliest, on August 30, 2023. Thus, he has approximately one month to file the earliest claim necessary to preserve his claims, and significantly more time to file several of the other claims. The court will accordingly dismiss all other claims in the lawsuit as misjoined without prejudice to Russo's right to file the claims in new lawsuits.[7]

**B.    Merits[8]**

**1.    Cold Temperatures**

Russo's civil rights claims arising from alleged exposure to cold temperatures sounds in deliberate indifference to a substantial risk of serious harm. Because

---

[6] The court's discussion of the merits is below.

[7] If plaintiff files a new lawsuit that again fails to comply with the joinder requirements of Rule 20, his claims may again be dismissed or severed.

[8] As noted above, see supra text accompanying note 6, this section only analyzes the merits of Russo's claims arising from allegedly cold temperatures, allegations that he ingested metal in his food, allegations related to his PREA complaint against defendant Knott, and alleged excessive force by defendant Vandergrift.

Russo was a pretrial detainee at the relevant time, the claim proceeds under the Fourteenth Amendment rather than the Eighth Amendment. Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581-82 (3d Cir. 2003). For purposes of deliberate indifference claims, however, the Fourteenth Amendment and Eighth Amendment standards are the same. Id. To state a deliberate indifference claim, a plaintiff must allege that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendants were deliberately indifferent to that risk; and (3) the defendants' deliberate indifference caused him harm. Williams v. Sec'y Pa. Dep't of Corrs., 117 F.4th 503, 514 n.58 (3d Cir. 2024).

Exposure to cold temperature may be the basis for a deliberate indifference claim when prison officials fail to take sufficient measures to ensure the prisoner's protection from the cold. See, e.g., Mamanna v. Fed. Bureau of Prisons, 934 F.3d 368, 373 (3d Cir. 2019) (citing Wilson v. Seiter, 501 U.S. 294, 304 (1991)). The claim may only proceed, however, if the plaintiff alleges that the conditions were extreme or that the plaintiff suffered significant harm or was likely to suffer such significant harm, see Bracey v. Sec'y Pa. Dep't of Corrs., 686 F. App'x 130, 136 (3d Cir. 2017); Freeman v. Miller, 615 F. App'x 72, 79 (3d Cir. 2015).

Here, Russo alleges neither extreme conditions of confinement nor a likelihood of significant harm from the exposure to cold temperatures. The complaint appears to allege only short-term discomfort caused by the cold temperatures in Russo's cell. (See Doc. 1 ¶¶ 2-9). This short-term discomfort is not sufficiently severe to state a deliberate indifference claim upon which relief may be granted.

## 2.    Metal in Food

Turning next to the claims arising from Russo allegedly ingesting a piece of metal from his food, the court construes the complaint to assert two claims for relief: (1) a claim for deliberate indifference to a risk of harm against defendant Perez; and (2) a claim for deliberate indifference to a serious medical need against defendant Eckenrode.

Russo's claim against Perez fails to allege Perez's personal involvement in the alleged civil rights violation. There is no allegation that Perez personally placed metal in Russo's food, directed others to do so, or knew about others doing so and acquiesced in the action. Rather, Russo appears to assert a claim against Perez solely because he held a supervisory role in the prison's kitchen and responded to Russo's grievance. (See Doc. 1 ¶ 23). Neither is sufficient to allege his personal involvement. See Rode, 845 F.2d at 1207; Dooley, 957 F.3d at 374.

With respect to the medical care claim against Eckenrode, Russo must allege "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale, 318 F.3d at 582 (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). Russo fails to allege a serious medical need. Although he alleges that he had blood in his bowel movement after passing the piece of metal and that he sought medical attention, there is no indication that the bloody stool posed a serious risk of harm to him or that he needed any further medical attention after Eckenrode discharged him from the prison's medical unit. (See Doc. 1 ¶¶ 25-26). Thus, because he fails to allege a serious medical need, he fails

to state a deliberate indifference claim against Eckenrode upon which relief may be granted.

### 3. PREA Complaint

With respect to the allegations arising from the PREA complaint against defendant Knott, Russo's complaint fails to state a claim upon which relief may be granted because it is unclear what civil rights violations, if any, he is alleging. The complaint does not allege what conduct led Russo to file a PREA complaint against him. Absent such an allegation, the court cannot conclude that the complaint states a claim against Knott or that the other defendants violated Russo's rights by failing to adequately investigate the PREA complaint.

### 4. Alleged Excessive Force by Vandergrift and Related Claims

Because Russo was a pretrial detainee when the facts of this case occurred, his excessive force claim against Vandergrift is governed by the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. Wharton v. Danberg, 854 F.3d 234, 247 (3d Cir. 2017) (citing Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979)).

Pretrial detainees are entitled to at least as much protection from excessive force as prisoners who have been convicted of a crime. Bistrian v. Levi, 912 F.3d 79, 91 (3d Cir. 2018) (citing Kost v. Kozakiewicz, 1 F.3d 176, 188 n.10 (3d Cir. 1993)). Unlike prisoners who have been convicted of a crime, who may not be subjected to cruel and unusual punishment, pretrial detainees "cannot be punished at all under the Due Process Clause." Hubbard v. Taylor, 399 F.3d 150, 166 (3d Cir. 2005) (citing Bell, 441 U.S. at 520). Thus, pretrial detainees may not be subjected to "excessive

force that amounts to punishment." Jacobs v. Cumberland Cnty., 8 F.4th 187, 194 (3d Cir. 2021) (quoting Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)).

Unlike excessive force claims under the Eighth Amendment, which require plaintiffs to establish both an objective element and a subjective element to prove excessive force, excessive force claims under the Fourteenth Amendment are based exclusively on an objective-reasonableness standard. Id. (citing Kingsley v. Hendrickson, 578 U.S. 389, 396-400 (2015)). Thus, a pretrial detainee seeking to establish that the use of force was excessive "must show *only* that the force purposely or knowingly used against him was objectively unreasonable." Id. (emphasis in original) (citing Kingsley, 578 U.S. at 396-97).

There is no mechanical formula for determining when force is objectively unreasonable under the Fourteenth Amendment. Kingsley, 578 U.S. at 397 (citing County of Sacramento v. Lewis, 523 U.S. 833, 850 (1998)). Instead, courts and juries must look to the particular facts and circumstances of the case, including "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id. (citing Graham, 490 U.S. at 396). These circumstances should be considered "from the perspective of a reasonable officer on the scene." Id. (quoting Graham, 490 U.S. at 396). A plaintiff can establish that the force used was excessive if he shows that the force was "not 'rationally related to a legitimate nonpunitive

governmental purpose'" or that the force used was "excessive in relation to that purpose." Id. (quoting Bell, 441 U.S. at 561).

In this case, Russo has adequately alleged excessive force in violation of the Fourteenth Amendment by defendant Vandergrift. Russo alleges that Vandergrift pepper-sprayed him while he was facing the wall and had his hands in the air. (Doc. 1 ¶ 34). If these allegations are accepted as true, as they must be at this stage of litigation, the use of pepper spray or any other force may have been excessive given that it is not apparent on the face of the complaint that Russo posed any threat to Vandergrift at the time of the incident. Accordingly, the excessive force claim against Vandergrift will be allowed to proceed. Russo's state law assault and battery claims will be allowed to proceed for substantially the same reasons.

The complaint asserts several other claims arising from defendant Vandergrift's alleged excessive force. First, the complaint alleges that defendants Murkison and Livingston used excessive force when they applied restraints and removed Russo's clothing following the alleged pepper spraying by Vandergrift. (Id. ¶ 38). These allegations, however, fail to state an excessive force claim upon which relief may be granted, because Russo has not alleged how the force the defendants used was excessive beyond conclusory statements that defendants used their "body weight and strength" to apply restraints and removed his clothing "in an excessive and forceful manner." (Id. ¶¶ 38, 43). These conclusory statements are not entitled to the assumption of truth and are not sufficient to state an excessive force claim.

Next, Russo alleges that defendant Reisinger violated his right to due process during the disciplinary hearing conducted following the incident with Vandergrift.

(Doc. 1 ¶¶ 45-48). This claim fails as a matter of law. Prison disciplinary proceedings only trigger procedural due process protections when the sanction imposed on the prisoner plaintiff constitutes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Here, the sanction imposed on Russo—70 days of disciplinary custody—does not constitute an atypical and significant hardship that would trigger procedural due process protections. See Murray v. McCoy, No. 23-2582, 2024 WL 1328231, at *3 (3d Cir. Mar. 28, 2024) ("90 days in disciplinary segregation, by itself, does not amount to an 'atypical and significant' hardship that implicates due process concerns."); accord Hill v. Harry, No. 1:21-CV-1424, 2023 WL 6522400, at *24 (M.D. Pa. Oct. 5, 2023).

Finally, to the extent Russo attempts to hold other defendants liable for defendant Vandergrift's alleged excessive force, the complaint fails to state a claim. It is not alleged that any other defendants were present in the cell when Vandergrift allegedly pepper-sprayed Russo or that any other defendants were aware of him doing so in the moment. (See Doc. 1 ¶¶ 28-36). Russo has accordingly failed to allege that any other defendants were personally involved in the alleged civil rights violation, and other defendants' supervisory roles in the prison is not sufficient to establish such personal involvement. Rode, 845 F.2d at 1207.

### C.    Leave to Amend

Before dismissing a civil rights complaint for failure to state a claim, courts must permit a curative amendment unless the amendment would be inequitable or futile. Phillips, 515 F.3d at 245. With respect to the due process claims against

defendant Reisinger the court finds that amendment would be futile because the claims fail as a matter of law. The court cannot say, however, whether amendment would be futile with respect to the excessive force claim against defendants Murkison and Livingston or with respect to claims that other defendants were personally involved in the alleged excessive force used by defendant Vandergrift. Accordingly, the court will allow Russo to amend these claims.

The court will also allow Russo to amend the claims arising from allegedly cold temperatures, allegations that Russo ingested metal in his food, and allegations related to his PREA complaint against defendant Knott. But because the court has severed these claims from the instant case as misjoined in violation of Federal Rule of Civil Procedure 20, any such amendments must be filed in the new cases that will be opened by operation of the order accompanying this memorandum.

All other claims in the lawsuit, as discussed above, will be dismissed from the case as misjoined without prejudice to Russo's rights to refile the claims in new lawsuits.

## IV.    <u>Conclusion</u>

Plaintiff's complaint is dismissed except to the extent that he alleges excessive force, assault, and battery by defendant Vandergrift. He will be granted leave to amend his excessive force claim against defendants Murkison and Livingston and his claims that other defendants were personally involved in Vandergrift's alleged excessive force. His due process claim against defendant Reisinger is dismissed without further leave to amend. His claims arising from allegedly cold temperatures, allegations that he ingested metal in his food, and

allegations related to his PREA complaint against defendant Knott will be severed into separate lawsuits, and he will be permitted to amend these claims in the severed cases. He will additionally be required to pay filing fees or move for leave to proceed *in forma pauperis* in each of the severed cases. All other claims are dismissed without prejudice to Russo's right to refile them in new lawsuits. An appropriate order shall issue.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated:    July 31, 2025